OPINION
{¶ 1} Plaintiff-appellant, the State of Ohio, appeals from an order suppressing evidence. The State contends that the trial court erred in concluding that the investigative stop leading to the discovery and seizure of the evidence was not supported by reasonable, articulable suspicion. We agree. Consequently, the order of suppression is Reversed, and this cause is Remanded for further proceedings consistent with this opinion
 I {¶ 2} In its decision, the trial court set out its findings of fact as follows:
 {¶ 3} "On February 10, 2006 between 6:30 and 7:00 p.m., Detective [David] House was conducting surveillance of businesses and parking lots located along Gettysburg Avenue [in Dayton], looking for loitering and other drug-related activities in this area which he testified was a busy drug-trafficking area. Detective House testified that for most of his fourteen years on the Dayton Police Department, he was involved in drug investigations, including street level drug sales, surveillance and following up on citizens' complaints of drug activity. Detective House further claimed that he has made thousands of drug arrests in his experience on the Dayton Police Department. In connection with this experience, House indicated that there are three kinds of drug transactions which he was looking for that night on Gettysburg Avenue. The first transaction is one in which public telephones in businesses' parking lots are used to arrange a drug transaction, after which the caller would leave and go to a more secluded area to conclude the deal. The second type of drug transaction occurs where the parties meet at the parking lot and then go to the more secluded area, and the third transaction type is one which takes place in the parking lot.
 {¶ 4} "On the night in question, House was in radio contact with other officers, and while watching the pay phone at the Church's Chicken on Gettysburg Avenue, Detective Doug Hall called for backup from the Kroger parking lot at Gettysburg and Oakridge Avenues, where he was conducting drug activity surveillance. Hall reported that an Oldsmobile with four subjects was proceeding slowly about the Kroger parking lot. While nothing came of this suspected automobile, House and Hall observed a red Honda Accord circle the Kroger parking lot, eventually parking next to House. The Accord contained two white females in the front seat with a black male in the backseat. House radioed the license plate number to Officer Jeffrey Watkins, who ran the tag of the Accord, learning that it had been stopped in a high drug area known as Western Manor recently, though with a male driver. After five to seven minutes of waiting, the driver of the Honda Accord immediately started its engine to follow a green Chevy Suburban which had pulled into the Kroger lot and came right to the front of the Accord, pausing as though waiting, before proceeding on.
 {¶ 5} "The officers followed these two vehicles, which ultimately turned from Gettysburg onto Delphos Avenue, after which they each pulled to the curb, the Accord behind the Suburban. House drove past the vehicles to the next intersection and as he did so he noticed the driver [sic — in his testimony, House actually identified this person as a passenger] of the Honda Accord, later identified as co-Defendant Debra Marcum, run to the passenger side of the green Chevy Suburban. House proceeded to the next intersection, made a u-turn, and as he pulled back toward the two vehicles, heading in the opposite direction now, the green Chevy Suburban was pulling away from the curb. At this time, House pulled to the middle of a relatively narrow Delphos Avenue, effectively blocking the Chevy Suburban. He emerged from his unmarked cruiser, with flashlight in hand, and approached the Chevy Suburban, finding the driver who was identified at the hearing as Defendant McGraw. House then asked McGraw to exit his vehicle to which request McGraw complied. House then handcuffed McGraw behind his back and patted him down for weapons. During this pat-down, McGraw indicated `it's down there' to House indicating the waste [sic — evidently "waist" is intended] pocket of his sweatshirt. House patted that area, and found a bag of heroin and a bag of cocaine. House removed these from the sweatshirt pocket, and McGraw indicated that he was `just trying to take care of my family.' Thereafter, McGraw was placed under formal arrest by House, and at this time, while standing next to the green Chevrolet Suburban, McGraw was given his Miranda rights verbally by House. After these rights were given, McGraw made statements concerning details of a drug transaction which had just taken place between he and Marcum, indicating that though Marcum was at the Suburban's passenger window, it was McGraw and not his passenger, Blythe, who had conducted the drug transaction with Marcum. Also following arrest, additional drugs, in gel caps, were found in the backseat of the green Chevy Suburban."
 {¶ 6} Based upon our review of the transcript of the suppression hearing, at which House was the sole witness, we would just add the following. House testified that: "And as I was driving past the vehicles [before making the u-turn and blocking McGraw's vehicle], the white female passenger of the Honda Accord, identified as a Debra Marcum, had already exited her car and was running up to the passenger side window of the Chevy Suburban," where he "observed her come up to the passenger side window and then lean into the window as I continued past the vehicles." By the time House made his u-turn and returned, Marcum "was just turning away from the passenger side of the window walking back to the Honda." This interval House confirmed as "just seconds."
 {¶ 7} Also, House testified that when he ordered McGraw out of the car and handcuffed him, preparatory to doing a weapons frisk, "I told him that he was not necessarily under arrest yet at that time." When asked why he handcuffed McGraw, House testified: "* * * it was my belief that a drug transaction had just taken place. And it's also my experience that quite frequently with drug sellers that there are weapons involved. On many occasions in these type of stops, we've recovered weapons from the vehicles, particularly of the sellers."
 {¶ 8} McGraw moved to suppress the evidence obtained as a result of the stop, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, the trial court agreed with McGraw, and ordered the evidence suppressed. From the suppression order, the State appeals.
 II {¶ 9} The State's sole assignment of error is as follows:
 {¶ 10} "DETECTIVE HOUSE HAD A REASONABLE AND ARTICULABLE SUSPICION OF DRUG ACTIVITY TO JUSTIFY STOPPING McGRAW'S VEHICLE. THE TRIAL COURT ERRED WHEN IT FOUND THE STOP TO BE UNLAWFUL AND SUPPRESSED THE EVIDENCE AND STATEMENTS."
 {¶ 11} The State does not deny that McGraw was stopped; the State contends that House had a reasonable and articulable suspicion of a drug transaction, justifying an investigative stop.
 {¶ 12} McGraw and the trial court rely upon State v. Jones
(1990), 70 Ohio App.3d 554, 591 N.E.2d 810, a decision of this court, for the proposition that the circumstances with which House was presented did not, in their totality, justify an investigative stop. The facts in Jones cited by the trial court in support of its conclusion that Jones controls the outcome in this case are as follows:
 {¶ 13} "Michael Sipes testified he had eleven years of experience as a Dayton Police officer and had been working for the Neighborhood Security Unit, a drug enforcement team, for the year and a half prior to arresting the appellant.
 {¶ 14} "Sipes stated he and three other Dayton Police officers were patrolling the area of West Fourth and Williams Streets in an unmarked van on August 8, 1989 when he observed the appellant sitting in the driver's seat of a parked car with Sherry Glanton, a person he had arrested and who had been convicted for drug abuse about a year earlier. Sipes stated that he observed three or four persons standing around the vehicle and there was one person on the passenger side leaning into the car. Sipes said that, as Sergeant Robert Reese pulled the unmarked van around the corner, these people saw them and the person leaning into the car stood up and all the people outside the car began to walk away in different directions.
 {¶ 15} "Sipes stated that he and the other officers were dressed in civilian clothes with blue windbreakers and `Dayton Police' stenciled on their jackets and police badges. Sipes stated that the area was a high drug area and that based on his experience he concluded the activities he had observed were consistent with drug dealing. Sipes said Reese thus pulled the van over, directly facing the front of the appellant's car, and they all, except Reese, exited the van. Sipes said Officers Goodwell and Armstrong went to stop the pedestrians while he walked up to the passenger side of appellant's car and asked Sherry Glanton to get out. Sipes stated he and the other officers were all wearing gun belts with their weapons exposed."
 {¶ 16} In concluding that there is even less of a basis in McGraw's case to justify reasonable, articulable suspicion, the trial court noted: (1) "in this case, subjects were not observed `leaning into' any vehicle involved"; (2) "the officers in this case did not recognize any of the subjects as being previously arrested for a drug offense"; and (3) "in this case, the vehicle was not parked but was pulling away when it was blocked by the police vehicle." While the second item noted by the trial court has some validity, we question the other two items. The fact that McGraw's car was pulling away from the curb when it was blocked seems immaterial in view of House's testimony that drug transactions typically are consummated in a matter of seconds, and House did, in fact, testify that he saw Marcum leaning into the passenger side window of McGraw's car. The trial court gave no indication that it discredited this portion of House's testimony, which was, of course, unrebutted.
 {¶ 17} Search and seizure issues are notoriously fact-sensitive. We conclude that House articulated a reasonable suspicion justifying an investigative stop. He identified the scenario in which one party to a drug transaction will "come loitering these parking lots for a period of time, someone will meet them there, and then will travel to a more secluded area, and then the transaction will take place," as a "very common practice in that area." House had spent most of his fourteen years as a police officer in the narcotics field, and has observed narcotics transactions "thousands" of times.
 {¶ 18} We conclude that there is a furtive aspect to the scenario House observed. When the Suburban driven by McGraw "crossed the front end" of the parked Honda, which had entered the Kroger parking lot, parked, and just sat there for five to seven minutes, with no one getting out, the driver of the Honda started the vehicle up, and followed the Suburban on a route that led to a more secluded area. It is reasonable to infer from these facts that the subsequent rendezvous of the two vehicles was planned, yet there was no overt acknowledgment by the occupants of either vehicle of the existence of the occupants in the other vehicle when they left the Kroger parking lot together.
 {¶ 19} On cross-examination, House acknowledged that it was a "possibility" that Marcum was just asking for directions. A police officer can have a reasonable, articulable suspicion of criminal activity without foreclosing every possibility that the circumstances he is observing have an innocent explanation. As long as a reasonable, articulable suspicion exists, the police officer is justified in conducting a brief, investigative stop in order to determine whether there is probable cause for a search and seizure, an arrest, or both, or whether, in fact, the events he has seen unfolding have a benign, or at least innocent, explanation.
 {¶ 20} We conclude, based upon the totality of the circumstances House observed, he had a reasonable, articulable suspicion that a drug transaction had taken place between the occupants of the Chevrolet Suburban and the occupants of the Honda Accord, which justified the stop. In the context of the pat-down, once McGraw told House, during the pat-down, "it's right here," nodding down toward his waist, we conclude that House had probable cause to believe that McGraw had a weapon, illegal drugs, or some other form of contraband, in the waist pocket of his sweatshirt.
 {¶ 21} The State's sole assignment of error is sustained.
 III {¶ 22} The State's sole assignment of error having been sustained, the order of the trial court suppressing evidence is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
Grady, P.J., and Walsh, J. concur.
(Honorable James E. Walsh, Twelfth Appellate District, sitting by assignment)